

# IN THE
# TENTH COURT OF APPEALS

## No. 10-14-00359-CR

JERRY LEE WATSON,

Appellant

v.

THE STATE OF TEXAS,

Appellee

**From the 413th District Court
Johnson County, Texas
Trial Court No. F48358**

## MEMORANDUM OPINION

Appellant Jerry Lee Watson was charged by indictment with five counts of indecency with a child by contact and one count (count six) of online solicitation of a minor. A jury found Watson guilty on four of the indecency counts (the State had abandoned one count) and on the online solicitation count. The jury made a "true" finding on the indictment's enhancement paragraph and assessed sentences of 99 years on counts one and two, life sentences on counts four and five, and 15 years on count six, along with a $5,000 fine. On the State's motion, the trial court ordered the cumulation of

the indecency sentences. Asserting four issues, Watson appeals. We will affirm.

In his first issue, Watson contends that the trial court abused its discretion in denying his mistrial motion after the State's allegedly improper argument in the guilt-innocence phase. This issue necessitates a brief summary of the evidence.

When Watson was sixteen years old, he molested K., his five year old relative, by penetrating her vagina with his fingers and placing his mouth on her vagina. Watson perpetrated this sexual assault by giving her candy and, when she resisted, wrestling her, picking her up, and throwing her on the bed. As a result of these sexual assaults, Watson was adjudicated guilty for three counts of aggravated sexual assault and was given a ten-year sentence as a juvenile. Upon his becoming an adult, Watson was transferred to the Texas Department of Criminal Justice. After serving every day of his ten-year sentence, Watson was released on August 31, 2012.

Upon his release from prison, Watson began attending a church where he encountered both of the victims in this case: L., age fourteen; and C., age eight. After Watson befriended L, they began communicating with each other over Facebook, the Kick application, and by text message. Watson, knowing that L. was only fourteen, told her in a Facebook conversation that if she were older, he would date her, and then said, "[B]ut we can only be friends." In the same conversation, however, Watson asked her to send him a picture of her naked. When he told her that she could have sex with him, L. agreed to only just "making out." Using the Kick application, Watson and L. then agreed to meet at a tent at L.'s house. While in the tent, Watson removed L.'s bra, touched her bare chest with his hand, forcefully pulled her pants down, and rubbed her vagina

under her clothes. After this, Watson forced L.'s hand onto his penis. Scared, L. pushed Watson off of her and left that area of the tent. Upon reporting the incident, L. was forensically interviewed at the Children's Advocacy Center. She also went to Cook Children's hospital for a medical examination, where she outcried to the sexual abuse, including that Watson had licked her vagina under her clothes.

After meeting C. at church, Watson began hanging out with her mother at their home. Soon thereafter, Watson began spending the night there on nights when C. was present. On multiple occasions, while on the couch with C., Watson touched the child between her legs, inside of her pants, and outside of her underwear.

During argument in the guilt-innocence phase, the following occurred:

> [Prosecutor]: And so then we get to the tent. This 14-year-old-girl, she's kind of nervous, excited perhaps. Her cousin is over. We know there's a tent. We've seen a picture of tent. We know it has dividers. I don't know how that's in any way contested. We know the dividers were up. There's been nobody that says that they weren't up. So I don't know where that came from. We know that it was towards the dark end, the night. Everybody said that. There's no inconsistencies here. And Jerry Watson walks in and they kiss and H. sees it. And then they separate and everybody that testified about this said she went to the other side of the divider. And what does he do? He reveals himself. He does the exact thing he started asking about on Facebook two days before. She's willing to make out, and he starts forcing himself on her. He lifts up her shirt. She doesn't want him to. And he touches her breast. This man, this predator. And then he pulls down her pants against her will, and he touches her vagina with his fingers and he inserts his penis -- his finger into vagina.

> [Defense counsel]: Judge, I'll object. The State's referring to a completely separate criminal offense that was not charged in this case, and no evidence was introduced to suggest that the Defendant's penis was inserted in anybody, much less the victim, [L.]. That's improper jury argument. They're raising offense that he was not charged with and that was not introduced as extraneous offense material.

[Prosecutor]: Judge, I said "penis." I'm sorry. Finger. It was a slip of the tongue.

[Defense counsel]: Judge, it's still the same thing. There was no -- he hasn't been charged with inserting anything into anything. This is indecency case.

THE COURT: Okay. I'll instruct the jury to disregard the comments. The jury heard what the evidence was, and you will base your verdict based on that evidence.

[Defense counsel]: Judge, the Defense would move for mistrial.

THE COURT: The Court will deny the Defendant's request for a mistrial.

The denial of a motion for mistrial, which is appropriate for "highly prejudicial and incurable errors," is reviewed under an abuse of discretion standard. *See Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) (quoting *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000)); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).

> [T]he question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis. A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." In effect, the trial court conducts an appellate function: determining whether improper conduct is so harmful that the case must be redone. Of course, the harm analysis is conducted in light of the trial court's curative instruction. Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required.

*Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Thus, the appropriate test for evaluating whether the trial court abused its discretion in overruling a motion for mistrial is a tailored version of the test originally set out in *Mosley v. State*, 983 S.W.2d 249, 259-60 (Tex. Crim. App. 1998), a harm analysis case. *See Hawkins*, 135 S.W.3d at 77. The *Mosley* factors that we consider in determining whether the trial court abused its discretion in denying a mistrial … are: (1) the prejudicial effect, (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *see Mosley*, 983 S.W.2d at 259.

*Abbott v. State,* 196 S.W.3d 334, 347 (Tex. App.—Waco 2006, pet ref'd).

Considering the *Mosley* factors, we cannot say that the trial court abused its discretion in denying the motion for mistrial. Any prejudicial effect from the prosecutor's comment, which clearly appeared to be a misstatement made in the context of Watson's multiple sexual assaults, was curable because the comment was quite brief, the prosecutor quickly acknowledged and apologized for it, and it was not repeated. *See Hawkins*, 135 S.W.3d at 84 ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless."). The trial court's instruction to disregard, which was the proper curative measure in this instance, was prompt and thus will ordinarily cure any harm. *Id.*; *see Wesbrook v. State,* 29 S.W.3d 103, 115-16 (Tex. Crim. App. 2000). Issue one is overruled.

In issue two, Watson contends that the trial court abused its discretion in denying his mistrial motion after the State's allegedly improper argument in the punishment phase. Our standard of review and the factors that we consider are the same as for such error in the guilt-innocence phase, except that we consider as the third factor the likelihood of the same punishment being assessed. *Hawkins*, 135 S.W.3d at 77.

During argument in the guilt-innocence phase, the following occurred:

[Prosecutor]: … So what do you do with Jerry Watson? What do you do with a man that had a history like Jerry Watson? What do we know about him? Starting at 15 years of age, we know that he shoots his friend, Jonathan Hood, on purpose, changing his life forever, changing Jonathan's life forever. He's puts on probation. And then at 16 – we're tracking his

life now -- 16, while he's on probation, he molests [K.]. Why? Because he thought he could get away with it. Then he goes to TYC. While he's there, we know he has 351 documented behavioral incidents and he's transferred to TDC. Then he gets out. And within a year, he's committed five new crimes that you convicted him of. That's what he's shown. That's all we know. That's the window into Jerry Watson. There's been no suggestion, no evidence of anything other than he is going to do whatever he wants, including killing people, raping people --

[Defense counsel]: Judge, I'm going to object. The State is making inflammatory remarks and referring to crimes that the Defendant has not been and has never been accused of or arrested for or charged, specifically, killing people. That's – that's a charge that hasn't even been offered in the State and it's inflammatory language and it's improper jury argument.

THE COURT: I'll sustain the objection.

[Defense counsel]: Judge, I would ask that the jury be instructed to disregard.

THE COURT: The Court will instructed [sic] the jury to disregard that statement and not consider it for any purpose in this case.

[Defense counsel]: And the Defense would move for mistrial.

THE COURT: The Court denies the motion for mistrial.

[Prosecutor]: We have shown in this case not that he killed anybody but that he tried. He tried to kill at the age of 15. By the time he's 16, we know all we need to know about Jerry Watson. Just look. When asked, he admitted that he used to think about homicide. These are in records that were reviewed and relied upon by Dr. Connell. He admitted that he was hearing voices. He admitted that he was contemplating ways to kill Jonathan Hood and that he intentionally tried to kill him. That is his friend. He has nothing against him. There's no evidence of any argument. He just decided I want to kill somebody, I've been thinking about it, plans it and shoots somebody and changes that life forever, homicidal.

Watson argues on appeal that the prosecutor went outside of the evidence in arguing that Watson had killed and raped people. Rule 33.1 applies to objections to jury argument. *See Threadgill v. State,* 146 S.W.3d 654, 667 (Tex. Crim. App. 2004); Tex. R. App.

P. 33.1(a). To preserve a complaint for appellate review, the issue on appeal must comport with the objection made at trial. *Wilson v. State,* 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). At trial, Watson objected only that Watson "has not been and has never been accused of or arrested for or charged, specifically, killing people." Accordingly, the complaint on appeal about "raping people" is not preserved for appellate review.

Jury argument is limited to: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) answers to argument of opposing counsel; and (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999).

The State argues that the complained-of comment was a reasonable deduction from the evidence and, as such, a mistrial was not warranted. Concerning the prosecutor's comment that Watson would kill if he wanted to, the prosecutor immediately clarified the statement by saying, "We have not shown in this case that he killed anybody but that he tried." It cannot be argued that the jury was left to speculate to what the prosecutor was referring.

The evidence shows that then-15 year old Watson tried to kill his childhood friend Jonathan Hood by shooting him in the abdomen with a shotgun from only a few feet away. Hood sustained serious bodily injuries. The State called Dr. Richard Connell, a psychologist who had evaluated Watson in 2004 for a determination of whether Watson should be transferred to TDCJ-ID. The jury heard about Watson's psychological records, which showed that he had stated that he had planned on killing Hood for weeks before the shooting, that he was trying to kill Hood, and that he, at times, heard voices. Dr. Connell then informed the jury that someone who plans to kill another and intentionally

pulls the trigger is "much more prone to aggression and likely to behave in an aggressive manner in the future." Moreover, evidence was adduced that Watson had 351 documented behavioral incidents while he was in the Texas Youth Commission facility.

We agree with the State that the prosecutor's comment that Watson would kill in the future if he so desired was a reasonable deduction from the evidence. Accordingly, the trial court did not abuse its discretion in denying Watson's motion for a mistrial. Issue two is overruled.

Watson's third issue complains that the trial court erred in overruling his objection to the testimony of Ricky Geer, a defense witness, about an extraneous offense that the State had failed to give notice of. Watson objected before Geer answered, and after hearing the anticipated testimony outside the presence of the jury, the trial court overruled the objection and was going to allow the testimony. But when they jury returned, the State did not question Geer again about the topic. Therefore, no error occurred, and issue three is overruled.

In issue four, Watson complains that the trial court erred in overruling his objection to the State's motion to cumulate Watson's sentences, which the trial court granted. Watson's argument in the trial court was that the jury's sentences on each count ought to be respected by not changing them to run consecutively. On appeal, Watson argues that the trial court's cumulation of Watson's sentences violates the constitutional prohibition against cruel-and-unusual punishment.

A defendant must raise his cruel-and-unusual punishment complaint in the trial court to preserve his complaint for appeal. *Ham v. State*, 355 S.W.3d 819, 825 (Tex. App.—

Amarillo 2011, pet. ref'd); *Gertz v. State*, No. 10-11-00008-CR, 2012 WL 3799146, at *2 (Tex. App.—Waco Aug. 30, 2012, no pet.) (mem. op., not designated for publication) (citing *Wynn v. State*, 219 S.W.3d 54, 61 (Tex. App.—Houston [1st Dist.] 2006, no pet.); and *Solis v. State*, 945 S.W.2d 300, 301 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd)); *see also Fuller v. State,* 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("In fact, almost all error—even constitutional error—may be forfeited if the appellant failed to object."). Because Watson did not raise in the trial court his complaint that his cumulated sentences are unconstitutionally cruel and unusual punishment, issue four is not preserved and is thus overruled. TEX. R. APP. P. 33.1.

Having overruled all four issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
 Justice Davis, and
 Justice Scoggins
Affirmed
Opinion delivered and filed June 22, 2016
Do not publish
[CRPM]

